UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION


FILED
SEP 16 2016
CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ARVIN BRAVE BIRD,<br><br>Defendant. | 3:16-CR-30061(01)-RAL<br><br>AMENDED REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS EVIDENCE AND STATEMENTS |

In this sexual abuse case, Arvin Brave Bird seeks to suppress, on Fourth and Fifth Amendment grounds, evidence that was photographed and seized from certain areas of an Indian country house (where he allegedly raped his adult niece), statements he made to an investigating tribal officer and DNA test results. Because none of this evidence is excludable, the Court recommends that Brave Bird's suppression motion be denied.

## BACKGROUND

On December 8, 2015, Rosebud Sioux Tribe Law Enforcement Services (RSTLES) Officer Luke Black Bear received a report from dispatch that Karen Connot had called and said that Brave Bird and Michael Yellow Eyes (Brave Bird's nephew) had sexually assaulted her. The officer met with and talked to Connot in his patrol car. She told him that she went to sleep and woke up, in the basement of a house nearby, with her uncle –

Brave Bird – on top of her and both of them were naked. According to Connot, Brave Bird kept trying to force himself on her, but she resisted and managed to get him off of her. After doing so, she saw Yellow Eyes sitting on the stairs to the basement and heard him say, "When's it going to be my turn?"

Brave Bird took his clothes and walked up the stairs, showered, got into a vehicle and drove away. When Yellow Eyes would not give Connot her cell phone, she went to a neighbor's home and called tribal police.

After transporting Connot to the Rosebud Indian Health Services Hospital, Officer Black Bear went to house number 555 in Fairgrounds Housing – where Connot disclosed she had been sexually violated – and knocked on the front door. Yellow Eyes answered the door. The officer inquired if Yellow Eyes lived at the residence and Yellow Eyes acknowledged that he did. The officer then asked if he could look in the basement of the home and Yellow Eyes replied, "Go ahead" and led the officer to this location. RSTLES Special Agent Robert Sedlmajer arrived at the home shortly thereafter and joined Officer Black Bear in the basement.

There, at the top of the basement stairs and in the kitchen, Officer Black Bear photographed evidence and collected several items, including a shirt, pair of shirts, comb, washcloth, pen tube, sunglasses, condom wrapper, condoms and several blankets. Agent Sedlmajer cut a portion of a mattress top, which had a wet stain on it, and took that into evidence as well.

Brave Bird was ultimately indicted on April 13, 2016, and charged with sexually abusing Connot. He was arrested on a federal warrant a week later in Rapid City, South Dakota.

Agent Sedlmajer interviewed Brave Bird that same day at the Pennington County Jail. Brave Bird was advised of his *Miranda* rights, waived them and made incriminating statements to the agent. He also provided the agent with a buccal swab which, along with other evidence, was tested and matched the DNA found on Connot's panties and inside of her.

Brave Bird moved to suppress the evidence taken from him (including the test results for it) and from the house and the statements he made to Agent Sedlmajer. A hearing was held on August 24, 2016, at which the Court heard testimony from two witnesses and received a number of exhibits into evidence. After the Court issued its report and recommendation, Brave Bird moved to reopen the hearing so that he could present additional evidence to refute certain portions of Agent Sedlmajer's testimony. Having granted the motion and considered the counter evidence (offered by written stipulation), the Court now issues this amended report, recommending again that Brave Bird's suppression motion be denied.

## DISCUSSION

**A. Standing**

A defendant must have "standing" to invoke the Fourth Amendment's exclusionary rule.[1] To have standing, the defendant must show that he had a legitimate expectation of privacy in the invaded place.[2] An expectation of privacy is legitimate if: (1) the defendant "by his conduct has exhibited an actual expectation of privacy; that is, . . . has shown that 'he [sought] to preserve [something] as private;'" and (2) his "expectation of privacy is 'one that society is prepared to recognize as reasonable.'"[3]

Here, Brave Bird had a lawful right to be in the residence he was occupying on December 8. He was the spouse of the tenant who leased the home. He was also listed in tribal occupancy applications dating back to 2007 as someone who was living in the home.[4]

Family members who reside in a dwelling, although not parties to the legal arrangements involving the occupancy of it, have very similar, if not essentially the same, standing dimensions. In *Bumper v. North Carolina*,[5] for example, the Supreme

---

[1]*See Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).

[2]*See Minnesota v. Olson*, 495 U.S. 91, 95 (1990).

[3]*Bond v. United States*, 529 U.S. 334, 338 (2000) (*quoting Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

[4]*See* Dkt. Nos. 74-1, 78.

[5]391 U.S. 543 (1968).

Court summarily concluded that there could "be no question of the petitioner's standing" to challenge a search of his grandmother's home during his absence because he lived there.[6] The Court later referred to *Bumper* approvingly as a case in which a defendant had standing because he had a "substantial possessory interest in . . . the house searched."[7] It follows then that a spouse of the person with the possessory interest also has standing to object to a search of that spouse's domicile.[8] Inasmuch as Brave Bird had a legitimate expectation of privacy in the home he was an inhabitant of at the time, he has the right to contest the search and seizure that took place inside of it.

---

[6]*Id.* at 548, n. 11.

[7]*Rakas*, 439 U.S. at 136.

[8]*See e.g. United States v. Whitehead*, 428 F.Supp.2d 447, 451 (E.D. Va. 2006) (husband had reasonable expectation of privacy in vehicle owned by his wife and thus had standing to challenge the search of it; he had continuous access to and unlimited use of the vehicle, the ability to exclude others from it and was married to its owner); *United States v. Wilcox*, 357 F.Supp. 514, 517-18 (E.D. Pa. 1973) (concluding that husband had standing to complain of a warrantless search of his wife's apartment, even though he was not present, because the search was directed at him and he had sufficient interest in the premises); *State v. Austin*, 320 N.C. 276, 289, 357 S.E.2d 641, 649 (1987) (defendant deemed to have standing although "family relationship" not formalized by marriage; it was sufficient that he lived there with the woman who paid rent and her daughters as a family for 5-6 years, kept all of his clothing on the premises and did his eating and sleeping there); *Brewer v. State*, 142 Miss. 100, 107 So. 376 (1926) (wife had legal grounds to complain of search of home she lived in that was rented to her husband); *compare United States v. Xavier*, Crim. No. 1:08-cr-00018, 2010 WL 446917 at *3 (D.V.I. Feb. 2, 2010) (husband had no expectation of privacy in his wife's home, where he did not reside); *see generally* 6 Wayne R. LaFave, *Search and Seizure*, §11.3(a) at 172-73 & n. 49 (5th ed. 2012 & 2014-15 Supp.)

## B. Consent

Even so, Brave Bird cannot succeed on the merits of his motion. This is because Yellow Eyes validly consented to the warrantless entry and search of the residence. And his consent, be it actual or apparent, was sufficient to bypass the Fourth Amendment's warrant requirement.

Generally, the police are required to obtain a warrant before entering a home.[9] When officers have entered a person's house without a warrant, the burden is on the prosecution to prove that they acted under a valid warrant exception.[10] One such exception is voluntary consent of a third party who shares "common authority over the premises or effects" to be searched,[11] provided that the defendant does not object.[12]

Common authority "cannot be implied from the mere property interest a third party has in the property."[13] The authority which justifies third party consent "rests on mutual use of the property by persons generally having joint access or control of the property so that it is reasonable to recognize that any of the co-inhabitants has the right

---

[9] See *Payton v. New York*, 445 U.S. 573, 590 (1980).

[10] See *United States v. Weston*, 443 F.3d 661, 667 (8th Cir.), *cert. denied*, 549 U.S. 956 (2006).

[11] *United States v. Matlock*, 415 U.S. 164, 170 (1974).

[12] See *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006); *see also United States v. Hudspeth*, 518 F.3d 954, 960-61 (8th Cir. 2008) (*en banc*) (holding that defendant must be physically present to overrule third party's consent).

[13] *Matlock*, 415 U.S. at 171, n.7.

to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched."[14]

A warrantless search is not vitiated by a mistake, on the part of the police, about the third party's authority over the premises, so long as the police reasonably believe that the third party had common authority to consent to the search.[15] The test is an objective one: "would the facts available at that moment 'warrant a demand of reasonable caution in the belief' that the consenting party had authority over the premises?"[16]

Although Yellow Eyes had no property interest in the home, he was a co-occupant who had mutual use of it. He lived in the house, had his own room there, bought food for it, and had free access to and shared possession of the same.[17]

Most consent cases involve jointly occupied places and a roommate who permits shared space to be searched. In this situation, a factual finding of common authority makes intuitive sense. "The space is jointly resided in; [and] the parties expect intrusions into each other's limited space as a function of communal living."[18] In Brave

---

[14]*Id.*

[15]*See Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990).

[16]*Id.* at 188 (*quoting Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

[17]*See* Mot. Hrg. Ex. 9 at 9-10, 16, 22-23, 25, 28 (Aug. 24, 2016).

[18]*United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003).

Bird's case, a finding that Yellow Eyes had common authority over the premises likewise makes instinctive sense.[19]

Regardless, whether Yellow Eyes actually had the authority to consent or not, his consent was still effective because Officer Black Bear had reason to believe he did. Yellow Eyes said that he lived at the residence, told the officer to "Go ahead," when the officer asked if he could look in the basement, and then led the officer from the front door, through the kitchen, down the steps, to the basement. No part of the basement was portioned off by a screen or curtain to create a zone of exclusivity around the mattress and there was nothing present to suggest that this was Brave Bird's private domain. Yellow Eyes appeared to have unrestricted and joint access to the entire house – including the kitchen, basement and stairway between them – and to know exactly where to go. Under these circumstances, it was reasonable for Officer Black Bear to believe that Yellow Eyes could validly consent to the entry into the home and to the search of certain portions of it.[20]

---

[19]See *Fernandez v. California*, 134 S.Ct. 1126, 1129-30, 1132-33 (2014); *Frazier v. Cupp*, 394 U.S. 731, 740 (1969); *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 835-36 (8th Cir. 2014); *United States v. Nichols*, 574 F.3d 633, 636 (8th Cir. 2009); *United States v. Escarsaga*, 182 Fed. Appx. 595, 598 (8th Cir. 2006); *United States v. Douglas*, 135 Fed. Appx. 4, 6 (8th Cir. 2005); *United States v. Jones*, 193 F.3d 948, 950 (8th Cir. 1999); see also 4 *Search and Seizure*, §8.5(c) at 298-99 & nn. 70, 71.

[20]See *Rodriguez*, 497 U.S. at 186-88; *United States v. Lindsey*, 702 F.3d 1092, 1096-97 (8th Cir.), cert. denied, 133 S.Ct. 2842 (2013); *Nichols*, 574 F.3d at 636-37; *United States v. Almeida-Perez*, 549 F.3d 1162, 1169-72 (8th Cir. 2008); *United States v. Janis*, 387 F.3d 682, 687 (8th Cir. 2004); *Iron Wing v. United States*, 34 F.3d 662, 665 (8th Cir. 1994); see also

(continued...)

## C. Plain View

Part and parcel of Brave Bird's Fourth Amendment claim is that Officer Black Bear and Agent Sedlmajer illegally photographed and seized evidence (blankets, clothing, comb, washcloth, pen tube, sunglasses, condoms, a condom wrapper and a mattress cutout) from the dwelling. Brave Bird contends that the officers had no right to be where they were when they discovered and snapped pictures of this evidence or took it without a search warrant.

The Supreme Court has long recognized that, in certain circumstances, a warrantless seizure of items come upon by the police "in plain view" during a lawful search of a home may be reasonable under the Fourth Amendment.[21] "The plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first hand, its owner's privacy interest in that item is lost; the owner may retain the incidents or title and possession but not privacy."[22]

"The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the

---

*United States v. Zastrow*, No. 4:16-CR-40004-KES, 2016 WL 3546240 at *5 (D.S.D. June 24, 2016) (consenter had apparent authority over the living/dining room area); *see generally* 4 *Search and Seizure*, §§8.3(f), (g) at 227-47.

[21] *See Horton v. California*, 496 U.S. 128, 133-37 (1990); *Arizona v. Hicks*, 480 U.S. 321, 323 (1987); *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971).

[22] *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).

9

property with criminal activity."[23] Police officers may thus seize incriminating evidence in "plain view" during the course of a lawful search because such a seizure "does not involve a privacy intrusion."[24] The practical justification for the doctrine is "the desirability of sparing police, whose viewing of the object in the course of a lawful search is as legitimate as it would have been in a public place, the inconvenience and the risk – to themselves or to preservation of the evidence – of going to obtain a warrant."[25] The doctrine also "reflects the fact that requiring police to obtain a warrant once they have obtained a first-hand perception of contraband, stolen property, or incriminating evidence generally would be a 'needless inconvenience' that might involve danger to the police and public."[26]

To invoke the "plain view" doctrine, the following requirements must be satisfied: (1) a police officer's initial intrusion must be lawful or the officer must otherwise properly be in a position from which he can view a particular area; (2) the incriminating character of the evidence must be immediately apparent; and (3) the officer must have a lawful right of access to the object itself.[27]

---

[23]*Payton*, 445 U.S. at 587.

[24]*Horton*, 496 U.S. at 141.

[25]*Hicks*, 480 U.S. at 327.

[26]*Texas v. Brown*, 460 U.S. 730, 739 (1983) (*quoting Coolidge*, 403 U.S. at 468).

[27]*See Horton*, 496 U.S. at 136-37; *United States v. Wilson*, 565 F.3d 1059, 1064-65 (8th Cir. 2009), *cert. denied*, 558 U.S. 1117 (2010); *United States v. Khabeer*, 410 F.3d 477, 482-83

(continued...)

10

The requirement that an object's incriminating nature be "immediately apparent" assures that the doctrine is not used to engage in "a general exploratory search from one object to another until something incriminating at least emerges."[28] "Immediate apparent," though does not mean that a police officer must be nearly certain as to the criminal nature of the item,[29] but rather, only that the officer have probable cause to believe the object is associated with some kind of criminal conduct.[30]

"Probable cause is a flexible, common-sense standard."[31] All it requires is a "practical, non-technical probability that incriminating evidence is involved."[32] Whether probable cause exists is determined based on an evaluation of the "facts viewed from the standpoint of an objectively reasonable police officer"[33] and "not on the officer's actual state of mind at the time the challenged action was taken."[34] In short, the probable cause determination is an objective one.[35]

---

(8th Cir. 2005).

[28]*Coolidge*, 403 U.S. at 466.

[29]*See Brown*, 460 U.S. at 741-42.

[30]*See Hicks*, 480 U.S. at 326; *Brown*, 460 U.S. at 741-42.

[31]*Brown*, 460 U.S. at 742.

[32]*Id.*

[33]*Ornelas v. United States*, 517 U.S. 690, 696 (1996).

[34]*Maryland v. Macon*, 472 U.S. 463, 470-71 (1985).

[35]*See id.*

Applying these principles here, the Court concludes that the three requirements to invoke the plain view doctrine were all met. Officer Black Bear had consent to enter and be in the residence. Stated differently, the officer and tribal police – through the collective knowledge doctrine[36] -- had probable cause to believe that the items observed in the basement and kitchen/stairwell areas were evidence of a sex crime. Lastly, the officers, functioning as a search "team," had a lawful right of access to the items that were photographed and seized.

## D. Voluntariness

Brave Bird claims that the statements he gave to Agent Sedlmajer at the Pennington County Jail were involuntary under the Fifth Amendment. He seeks to exclude these statements, presumably as both substantive and impeachment evidence.

At the outset, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statements was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of *Miranda* are rare."[37] That is not to say compliance with *Miranda* conclusively establishes the voluntariness of later made statements.[38]

---

[36]*See Wilson*, 565 F.3d at 1065; *United States v. Armstrong*, 554 F.3d 1159, 1163 (8th Cir.), *cert. denied*, 557 U.S. 910 (2009); *United States v. Banks*, 514 F.3d 769, 775-76 (8th Cir.), *cert. denied*, 553 U.S. 1100 (2008).

[37]*Dickerson v. United States*, 530 U.S. 428, 444 (2000) (*quoting Berkemer v. McCarty*, 468 U.S. 420, 433, n.20 (1984)).

[38]*See Berkemer*, 468 U.S. at 433, n.20.

Brave Bird's *Miranda* advisements, however, make it much more difficult for him to rebut the prosecution's assertion that his statements to Agent Sedlmajer were voluntary.

The Fifth Amendment prohibits the use of involuntary statements at trial.[39] Whether statements are voluntary or not depends on whether they are "the product of an essentially free and unconstrained choice by [their] maker[.]"[40] If they are, then the suspect has "willed [himself] to confess" and his statements may be used against him.[41] If they are not, then the introduction of his statements "offends due process."[42] The dispositive question, in terms of voluntariness, is whether the statements were obtained by "threats, violence, or express or implied promises sufficient to overbear the [suspect's] will and critically impair his capacity for self-determination."[43] When deciding this question, a court must look at the totality of the circumstances, including the "conduct of the officers and the characteristics of the [suspect]."[44] The burden of

---

[39] *See Chavez v. Martinez*, 538 U.S. 760, 769 (2003); *United States v. LeBrun*, 363 F.3d 715, 719-20 (8th Cir. 2004) (*en banc*), *cert. denied*, 543 U.S. 1145 (2005); *see also Schneckloth*, 412 U.S. 218, 225-26 (1973) (voluntary confession may be used against suspect, but an involuntary one offends due process).

[40] *Schneckloth*, 412 U.S. at 225.

[41] *Id.*

[42] *Id.* at 225-26.

[43] *LeBrun*, 363 F.3d at 724; *see Schneckloth*, 412 U.S. at 225-26.

[44] *LeBrun*, 363 F.3d at 724; *see Schneckloth*, 412 U.S. at 226.

persuasion rests with the prosecution and it must prove voluntariness by a preponderance of the evidence.[45]

Having listened to the audio recording made of Agent Sedlmajer's interview of Brave Bird at the jail, the Court concludes that the requisite coercive or overreaching conduct necessary to render Brave Bird's statements involuntary is lacking. Several facts support this conclusion.

Brave Bird was 47 years old, had 10 ½ years of formal education and could read, write and understand the English language. He was advised of, and affirmed that he understood, his *Miranda* rights and waived them in writing. The interview lasted about 51 minutes and he never requested to suspend or terminate it.

Significantly, at no time did Agent Sedlmajer make any threats or promises to Brave Bird. Nor did the agent yell, swear, bully or use any deceptive stratagems to get Brave Bird to confess. The duration, tone and overall atmosphere of the interview were not hostile or intimidating. Brave Bird cooperated – agreeing to answer questions without a lawyer present and providing the agent with a buccal sample – and maintained that the sexual intercourse he had with Connot was consensual and that she was the aggressor who "came on" to him.

Brave Bird's responses to questions from Agent Sedlmajer were logical and understandable. While with the agent, Brave Bird was not under the influence of

---

[45]*See Missouri v. Seibert*, 542 U.S. 600, 601, n.1 (2004); *LeBrun*, 363 F.3d at 724.

alcohol or drugs. What's more, nothing Brave Bird said or did indicated that he was impaired to the extent that he did not know what he was doing or indicated that he had any kind of mental or cognitive infirmity.

The record as a whole unequivocally shows that Brave Bird's statements were voluntary. The statements were ones he wanted to make and were not the product of an environment and questioning that was so coercive it overbore his will and shoehorned his decision making capacity. This being the case, Brave Bird's voluntariness claim, whether based on the Fifth Amendment or otherwise, cannot succeed.

### E. Tainted Fruit

Brave Bird lastly claims that both his statements and the buccal sample he provided (including the DNA test results derived therefrom) were the poisonous fruit of an illegal search and seizure. These illegalities, he says, require suppression of this evidence under the exclusionary rule.[46] Brave Bird's claim is unavailing. Officer Black Bear had consent to enter the home and search the basement and kitchen/stairwell areas. And the evidence that was photographed and later seized was found in plain view and taken without infringing on the Fourth Amendment. There being no

---

[46] See Wong Sun v. United States, 371 U.S. 471, 484-88 (1963) (admissions by a defendant that flow from a Fourth Amendment violation must be suppressed).

poisonous tree from which any tainted fruit could fall,[47] Brave Bird's statements and the cheek swab (as well as the test results gleaned from it) are all admissible at trial.

## CONCLUSION

As the tenant's spouse, a long-standing occupant of the home, and one who had permission to reside on the premises, Brave Bird has standing to make a Fourth Amendment challenge. But standing to complain gets him nowhere because Yellow Eyes had sufficient authority, whether actual or apparent, over the basement, the stairs leading to it, and the kitchen to consent to the warrantless search of these areas. The photographs taken and the seizure of items from all three areas were also proper under the plain view doctrine.

Brave Bird's statements at the county jail were voluntary and made in compliance with the Fifth Amendment. He was not coerced, duped or impermissibly swayed into admitting to something against his will.

And his statements were not the byproduct or "tainted fruit" of any Fourth Amendment violation. They thus did not fall prey to the jaws of the exclusionary rule.

## RECOMMENDATION

Accordingly, it is hereby

---

[47]See *United States v. Hessman*, 369 F.3d 1016, 1024 (8th Cir. 2004), *cert. denied*, 543 U.S. 1072 (2005).

RECOMMENDED that Brave Bird's Motion to Suppress Evidence and Statements[48] be denied for the reasons, and based on the authorities, stated herein.

### NOTICE

The parties have 14 calendar days after service of this report and recommendation to file their objections to the same.[49] Unless an extension of time for cause is obtained,[50] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[51] Objections must "identify[] those issues on which further review is desired[.]"[52]

DATED this 15th day of September, 2016.

BY THE COURT:

*[signature]*

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

---

[48] *See* Dkt. No. 44.

[49] *See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[50] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (citing *Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[51] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[52] *Arn*, 474 U.S. at 155.