UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ARVIN BRAVE BIRD,<br><br>Defendant. | 3:16-CR-30061-01-RAL<br><br>OPINION AND ORDER ADOPTING<br>REPORT AND RECOMMENDATION |

The Government charged Arvin Brave Bird with sexual abuse and aggravated sexual abuse. Doc. 1. Brave Bird moved to suppress evidence obtained from his home on unlawful search and seizure grounds, and to suppress incriminating statements he made to an investigator under the "fruit of the poisonous tree" doctrine and voluntariness grounds. Doc. 45; Tr. at 4–5. After holding an evidentiary hearing and receiving additional written stipulated evidence, Magistrate Judge Mark A. Moreno issued an Amended Report and Recommendation, recommending that Brave Bird's motion be denied in its entirety. Doc. 80 at 16–17. Brave Bird has filed timely objections to that recommendation. Doc. 81. This Court has conducted a de novo review of the record, and for the reasons explained below, overrules Brave Bird's objections and adopts Judge Moreno's Amended Report and Recommendation.

**I. Facts**

On December 8, 2015, Karen Connot met with Rosebud Sioux Tribe Law Enforcement Services Officer Luke Black Bear to discuss an alleged sexual assault that had occurred the previous evening. Tr. at 14–15, 24. Connot told Officer Black Bear that she was sexually assaulted by Arvin Brave Bird and Michael Yellow Eyes, but did not directly say that Yellow Eyes had sex with her. Tr.

1

at 15, 26. Officer Black Bear took Connot to the Rosebud Indian Health Service hospital for an evaluation. Tr. at 15. While at the hospital, Connot told Special Agent Bob Sedlmajer that after an argument with her boyfriend, she went to her uncle Brave Bird's home to stay for the evening. Tr. at 33. According to what Connot told Agent Sedlmajer, when she awoke, Brave Bird was on top of her having intercourse with her, and Yellow Eyes was on the stairs asking if it was his turn now. Tr. at 34.

Officer Black Bear went to the residence where Connot claimed the incident happened. Tr. at 15. When Officer Black Bear arrived at the residence, Yellow Eyes met him at the door, said that he lived at the residence, and agreed to let Officer Black Bear search the basement area of the home, where the alleged sexual assault took place. Tr. at 15–16, 24. On the way to the basement, Officer Black Bear observed a condom wrapper under the kitchen table, and an unused condom at the top of the basement stairs. Tr. at 16. Once in the basement, Officer Black Bear noted that there was a mattress in the northwest corner, and that the basement was a "big open area." Tr. at 16. He also noticed several other items, including blankets, clothing, and a pair of sunglasses, that Agent Sedlmajer had told Officer Black Bear would be in the basement, based on Agent Sedlmajer's interview with Connot. Tr. at 16–17. Officer Black Bear photographed and seized this evidence, and Yellow Eyes was arrested. Tr. at 17; see also Gov't Ex. 2 (describing as evidence taken a black shirt, shorts, and grey comb; three grey blankets; one blue blanket; a portion of a mattress top; a washcloth; a pen tube; condom wrapper and condoms; a bag containing condoms; and a pair of pink sunglasses); Doc. 45 (Defendant's motion to suppress objecting to the same evidence, absent the bag of condoms). Officer Black Bear testified that while he was in the home with Yellow Eyes, there was no indication from Yellow Eyes that he did not live in the home. Tr. at 23. Agent Sedlmajer also testified that he received no information or indication on the day of the search that Yellow Eyes could not consent to a search of the home. Tr. at 57.

2

On April 13, 2016, the grand jury indicted Brave Bird on charges of aggravated sexual abuse and sexual abuse under 18 U.S.C. §§ 1153, 2241(a), 2242(2), 2246(2) and 2. Brave Bird was arrested on April 20, 2016, and after receiving his Miranda rights, was interviewed by Agent Sedlmajer on that same day. Gov't Ex. 20 at 00:50–2:08; Doc. 22; Tr. at 45–46. During the course of the interview, Brave Bird told Agent Sedlmajer that he did not have sex with Connot on the night in question, and Agent Sedlmajer repeated those statements back to Brave Bird. See, e.g., Gov't Ex. 20 at 18:40, 27:45; Tr. at 54. Agent Sedlmajer asked to obtain a buccal swab from Brave Bird, discussing with Brave Bird that if he did not have sex with Connot on that night, his DNA would not show up as a match to the DNA found from Connot's sexual assault kit. Gov't Ex. 20 at 20:00– 23:00; Tr. at 54. After forty minutes, Brave Bird admitted that he did have sex with Connot on the evening of December 8, 2015, but said that she initiated it. Gov't Ex. 20 at 39:50–43:07; Tr. at 56.

On July 5, 2016, Brave Bird filed a motion to suppress the photographs and evidence taken from the home as being obtained in an illegal search and seizure under the Fourth Amendment, and a motion to suppress his statements made to Agent Sedlmajer and the buccal swab given during the April 20, 2016 interview on the grounds that they were fruit of the poisonous tree from the illegal search, and further to suppress his incriminating statements as being the result of improper interrogation by Agent Sedlmajer that overbore his will. Doc. 45. Magistrate Judge Moreno conducted an initial hearing, issued a report and recommendation, and then re-opened the hearing to allow additional evidence via written stipulation showing that Brave Bird was a listed occupant of the home. Docs. 63, 66, 78. Judge Moreno then issued an Amendment Report and Recommendation Denying the Motion to Suppress. Doc. 80.

## II. Discussion

This Court reviews a report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1), which provides that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to

3

which objection is made." 28 U.S.C. § 636(b)(1). In particular, a district court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. Brave Bird contends that Yellow Eyes did not have the actual or apparent authority to consent to a search of the basement where the incriminating evidence was seized, the evidence was not immediately incriminating so as to allow for the application of the plain view doctrine, and the incriminating statements made by Brave Bird and the buccal swab taken from him were obtained only after his will was overborn and are inadmissible under the fruits of the poisonous tree doctrine. Having conducted a de novo review, this Court adopts the Amended Report and Recommendation.

## A. Yellow Eye's Consent to Search the Residence

Protecting an individual's privacy interest in their own home, the Fourth Amendment generally requires police officers to obtain a warrant before entering and searching a residence. Payton v. New York, 445 U.S. 573, 590 (1980). If police enter a defendant's residence without a warrant, the prosecution must "prove that the police acted pursuant to a valid exception to the warrant requirement." United States v. Almeida-Perez, 549 F.3d 1162, 1169 (8th Cir. 2008). Obtaining the consent of a third party who shares "common authority over the premises" to be searched is one such exception. United States v. Matlock, 415 U.S. 164, 170 (1974); Georgia v. Randolph, 547 U.S. 103, 122–23 (2006) (holding that third-party consent is invalid if the defendant is present and objects to the search).

The questioning at the evidentiary hearing, arguments made in the motion to suppress, legal standard used by Judge Moreno, and objections to the Amended Report and Recommendation focused more heavily on whether it was reasonable for Officer Black Bear and Agent Sedlmajer to believe that Yellow Eyes had the authority to consent to a search of the basement, regardless of whether he had the actual authority to consent to such a search. See Tr. at 36 ("Your Honor, I'm going to object at this point because it's irrelevant what the agent learned about ownership of the house after the search. The question is at the time of the search, did he have knowledge from SWA

4

that that house was being jointly owned by more than one person, more than Arvin Brave Bird. I think after the fact it's irrelevant at that point."); see also Doc. 45 at 3; Doc. 48 at 2, 4–5; Doc. 81 at 2. Based on the evidence presented at the hearing, Judge Moreno made a factual finding that Yellow Eyes was a "co-occupant" of the home because "[h]e lived in the house, had his own room there, bought food for it, and had free access to and shared possession of the same." Doc. 80 at 7; see Tr. at 48–49. Even if Judge Moreno's finding that Yellow Eyes was a co-occupant with common authority was incorrect, it nevertheless appeared to Officer Black Bear and Agent Sedlmajer that Yellow Eyes had the authority to consent to a search of the home at the time. Thus, this Court need not determine whether Yellow Eyes had actual authority to authorize the search; Yellow Eyes clearly had apparent authority to do so and gave consent to Officer Black Bear in a way to justify the search.

An officer's mistake regarding whether the third-party had the actual authority over the premises to consent to a search does not make the resulting search illegal, so long as "'the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises." Illinois v. Rodriguez, 497 U.S. 177, 188 (1990) (quoting Terry v. Ohio, 392 U.S. 1, 21–22 (1968)); see also United States v. Elam, 441 F.3d 601, 603 (8th Cir. 2006). In considering whether an individual has apparent authority over a home, an officer should not just rely on a statement that the individual lives at the home and invites the officer inside, especially if "surrounding circumstances" suggest that "a reasonable person would doubt [the statement's] truth and not act upon it without further inquiry." Rodriguez, 497 U.S. at 188. However, officers are "entitled to draw the usual inferences from what they see and hear." Almeida-Perez, 549 F.3d at 1170.

The Eighth Circuit has summarized its third-party consent jurisprudence to "suggest that where a person exercises privileges that would only be proper for an occupant of the house, the police may draw the inference that the person is indeed an occupant unless there are other circumstances that would cause a reasonable man to doubt the validity of that inference." Id. at 1171

5

(finding apparent authority to consent where third party was relaxing on the front porch, entered and left the home without knocking, and let officers inside without asking permission from anyone); see United States v. Nichols, 574 F.3d 633, 636–37 (8th Cir. 2009) (finding apparent authority to consent where third party met officers at the door, was familiar with the home, and freely operated a computer inside the home); United States v. Hilliard, 490 F.3d 635, 639–40 (8th Cir. 2007) (finding it was reasonable for officers to believe third party could consent to a search where she invited officers into home, collected personal clothing, and instantly directed officers to contraband); United States v. Janis, 387 F.3d 682, 687 (8th Cir. 2004) (finding apparent authority where third party entered house without knocking, gestured for officers to enter, and spoke of "her room" in the house); Iron Wing v. United States, 34 F.3d 662, 665 (8th Cir. 1994) (third party had apparent authority to consent where she indicated she lived in the home, had left one of her bedroom windows unlocked, and crawled into the home through the unlocked window).

Brave Bird argues that the consent was not valid because at the time of the search Officer Black Bear did not have any physical evidence that Yellow Eyes had the actual authority to consent to a search. Doc. 81 at 3, 5. However, the Supreme Court has established that "it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent." Randolph, 547 U.S. at 122. Therefore, the fact that Officer Black Bear witnessed Yellow Eyes answer the door from within the residence, Tr. at 15, and respond in the affirmative that he lived there, Tr. at 15–16, coupled with no circumstances that would cause him to understand otherwise, Tr. at 27, was enough for the officer to believe that Yellow Eyes had the apparent authority to consent to a search of the home. In addition, Yellow Eyes did not ask permission from anyone before allowing Officer Black Bear to enter the home, Tr. at 15–16, knew the way from the front door to the basement, Tr. at 16, 23, did not ask permission from anyone to direct Officer Black Bear to the basement area, Tr. at 16, and gave Officer Black Bear no reason to think he could not consent to a search of the residence, Tr. at 27.

6

Contrary to Brave Bird's assertions, Doc. 81 at 5, information an officer observes after crossing the threshold of a home is critically important in the continuing determination made by the officer whether there were any counterbalancing facts indicating the third party did not have the authority to consent to a search of the home. See, e.g., Nichols, 574 F.3d at 636–37 (third party operated computer with ease, after entry into the home); Hilliard, 490 F.3d at 639–640 (third party collected her own clothing from the floor, after entry into the home).

Brave Bird next argues that it was inappropriate for Yellow Eyes to consent to a search of the basement, because he did not have "common authority over the place[] search[ed]," Doc. 45 at 3, and just because "no part of the basement was portioned off" did not mean that it was not someone's private room, Doc. 81 at 5. The Eighth Circuit has been consistent in holding that a basement is a common area of a home, and thus not subject to a heightened expectation of privacy. See United States v. McGrane, 746 F.2d 632, 634 (8th Cir. 1984) (no expectation of privacy in a basement accessible to all tenants and the landlord of an apartment building); United States v. Campbell, 242 F.3d 377 (Table) (8th Cir. 2000) (per curiam) (no reasonable expectation of privacy in basement storage area when homeowners consented to search); Fagnan v. City of Lino Lakes, 745 F.3d 318, 322–23 (8th Cir. 2014) (finding that where homeowners consented to entry of basement for possible gas leak, sawed off shotguns in plain view of the area of the gas leak concern were not outside the scope of the consent); see also United States v. James, 353 F.3d 606, 613 (8th Cir. 2003) ("Most consent cases involve jointly occupied places and a roommate or cotenant who allows a search of a shared space. In these instances, the factual finding of common authority makes intuitive sense. The space is jointly resided in; the parties expect intrusions into each other's limited space as a function of communal living." (internal citation omitted)); 4 Wayne R. LaFave, Search & Seizure § 8.5(c) (5th ed. 2016) (describing as "easy" cases of consent by a third party that involve common areas, including basements). Even when an individual is living in the basement, a heightened level of privacy is generally not warranted unless there is a clearly delineated bedroom separated from the

stairs and the rest of the basement, and other members of the household do not access the basement bedroom without the occupier's permission. See United States v. Hendrix, No. 4:11CR413 JCH/DDN, 2012 WL 1309278, at *4 (E.D. Mo. Mar. 30, 2012), adopted by No. 4:11CR413 JCH (DDN), 2012 WL 1309272 (individual had apparent authority to guide officers to basement room where the individual opened the front door and invited officers in, door to basement was open, and there was no separation between bottom of basement stairs and first room); United States v. Derden, No. 12–CR–0012 (PJS/SER), 2012 WL 1948765, at *1 (D. Minn. May 30, 2012) (finding that where homeowner led officers to the basement where another individual was living, there was apparent authority to consent to a search of the basement); United States v. Zastrow, No. 4:16-CR-40004-KES, 2016 WL 3546240, at *4–5 (D.S.D. June 24, 2016) (finding actual and apparent authority of homeowner to consent where individual slept on homeowner's loveseat in the living room, homeowner had to cross through living room to reach the kitchen and basement, and the living room was still functioning as a living room); see also United States v. Marte-Cruz, 629 Fed. App'x 89, 90–91 (2nd Cir. 2015) (third party had authority to consent to search of basement bedroom and bed where there was a closet containing household items and circuit breaker in the room, the home's occupants accessed the room once or more a week, and there were no steps taken to restrict access to a portion of the room).

This Court has reviewed the photographs entered into evidence of the basement of the residence. The basement area is not separated by a door from the bottom of the stairs, and there does not appear to be any apportionment of rooms within the basement. Gov't Ex. 3 at 8–10. Furthermore, there was no testimony or evidence produced that indicate an individual lived full time in the basement,[1] and the photographic evidence shows only a mattress and table, with no personal items in the basement typically found in a bedroom. Gov't Ex. 3 at 10. There was no reason for

---

[1] See, e.g., Tr. at 29 ("Q: Did Mr. Yellow Eyes indicate to you who slept in or used that mattress in the basement? A: No, your Honor."); Tr. at 33 ("She [Connot] asked Arvin if she could stay there. Arvin said, yes, you can stay on the bed in the basement. You can sleep there tonight.").

8

Officer Black Bear to conclude that Yellow Eyes lacked the apparent authority to consent to a search of the basement.

## B. Plain View Doctrine

Brave Bird next objects to Judge Moreno's finding that the plain view exception justifies photographing and seizing several objects from the basement. The plain view doctrine is an extension of the specifically delineated exceptions to the warrant requirement of the Fourth Amendment. Horton v. California, 496 U.S. 128, 133 (1990). "Under the plain-view exception, officers may seize an object without a warrant if they are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object." United States v. Muhammad, 604 F.3d 1022, 1027 (8th Cir. 2010).

Because Yellow Eyes had the apparent authority to consent to a search of the basement, the officers were lawfully in a position to view and access the seized objects, meeting the first and third requirements of the plain view exception. See Soldal v. Cook Cnty, 506 U.S. 56, 65–66 (1992); PPS, Inc. v. Faulkner Cty, 630 F.3d 1098, 1104–05 (8th Cir. 2011). For the incriminating character of an object to be immediately apparent, the officer must have "probable cause to believe an item is incriminating." Muhammad, 604 F.3d at 1027 (quoting United States v. Green, 560 F.3d 853, 858 (8th Cir. 2009)). Probable cause in this context requires that "the facts available to a reasonably cautious man would warrant a belief that certain items may be . . . useful as evidence of a crime." United States v. Green, 560 F.3d 853, 858 (8th Cir. 2009) (quoting United States v. Garner, 907 F.2d 60, 62 (8th Cir. 1990)). Although some of the objects photographed and seized from the basement would not ordinarily be considered immediately incriminating, such as a shirt and sunglasses, probable cause exists when the crime being investigated is a sexual assault and the alleged victim has indicated the location of the alleged assault and specific items, including clothing, blankets, and a mattress, that could be found in that location. See Tr. at 16–17; United States v. Bear, No. 3:14-CR-

9

30122-RAL, 2015 WL 1969413, at *8 (D.S.D. May 1, 2015) (finding probable cause to photograph and seize clothing, bedding, towels, and a loofah where police had been told of an alleged sexual assault that occurred in the room); LaFave, supra § 6.7(a) (explaining and citing cases where officers seize clothing under the plain view doctrine where there is probable cause to believe it belonged to the victim or perpetrator of a crime). Thus, the evidence photographed and seized from the residence was lawfully seized under the plain view doctrine.

## C. Voluntariness of Statements Made to Agent Sedlmajer

Brave Bird next argues that his incriminating statements to Agent Sedlmajer only occurred after the questioning and interrogation overbore his will. Doc. 81 at 7. The Fifth Amendment privilege against self-incrimination precludes the use of incriminating statements made by defendants if those statements were involuntary as a result of an overborne will and critical impairment of self-determination because of "threats, violence, or direct or implied promises" made by police. United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995); see also Miranda v. Arizona, 384 U.S. 436, 467 (1966); Schneckloth v. Bustamonte, 412 U.S. 218, 226–27 (1973); United States v. LeBrun, 363 F.3d F.3d 715, 724 (8th Cir. 2004) (en banc). In determining whether a statement was involuntary, both the conduct of the police and the personal characteristics of the defendant must be considered. See Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004) ("We consider, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition."); LeBrun, 363 F.3d at 724; United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (holding that tactics used by the police in an interrogation are "highly relevant," but that a defendant "must still prove that her incriminating statements were the product of an overborne will").

As required when a defendant is in a custodial situation, Agent Sedlmajer read Brave Bird his Miranda rights before initiating questioning regarding the alleged sexual assault. Gov't Ex. 20 at 00:50–2:08. Brave Bird also completed a form confirming that he had been read his rights and

10

understood them. Gov't Ex. 20 at 2:10–4:30. While compliance with Miranda does not resolutely determine that a confession is voluntary, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2001) (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984)).

At the evidentiary hearing, Brave Bird focused on Agent Sedlmajer repeating back to Brave Bird his statement about not having sex with Connot, and Agent Sedlmajer telling Brave Bird that a buccal swab would reveal if this was true, as evidence that Agent Sedlmajer's interrogation overbore Brave Bird's will. See Tr. 54–56. Brave Bird also focused on Agent Sedlmajer's statement to Brave Bird that he had heard Connot was wanting to have sex that evening. Tr. at 55. The audio recording of the interview of Brave Bird by Agent Sedlmajer belies arguments that Brave Bird's will was overborne. Brave Bird admitted that he had consensual sex with Connot in the past just eighteen minutes into the interview. Gov't Ex. 20 at 18:40. Shortly after this point, Agent Sedlmajer repeated back to Brave Bird his statement that nothing happened between Brave Bird and Connot on that night, and asked if he can take a buccal swab from Brave Bird, who agreed and then signed a consent form. Gov't Ex. 20 at 20:00–23:00. After taking the buccal swab from Brave Bird, Agent Sedlmajer asked again if Brave Bird had sex with Connot at all that night, and Brave Bird responded no. Gov't Ex. 20 at 25:50. After Brave Bird admitted that sex may have happened on a separate occasion "bout a week ago," Gov't Ex. 20 at 30:10, Agent Sedlmajer used interview tactics to obtain further information, which involved empathizing with Brave Bird about consensual sex urges, Gov't Ex. 20 at 39:00, and asking again if Brave Bird remembered having sex with Connot that night, Gov't Ex. 20 at 39:53. While Agent Sedlmajer did use sympathetic statements that Connot may have been "egging herself onto" Brave Bird, this occurred after Brave Bird stated that Connot was "was egging it on" in connection with a different individual, and after Brave Bird had admitted to having sex with Connot once during November, and possibly again a week prior to the interview. Gov't Ex. 20 at

11

18:41, 30:11, 36:05, 37:28. Brave Bird's initial incriminating statements in relation to sex on that evening were that "she might've came into my room . . . might've kissed me." Gov't Ex. 20 at 39:47. In response, Agent Sedlmajer asked blankly: "Do you remember having sex with her?," after which Brave Bird said "I think so" and described the sex in detail. Gov't Ex. 20 at 39:50–43:07. At no point did Agent Sedlmajer raise his voice, threaten Brave Bird, or make any direct or implicit promises[2] regarding the outcome of the buccal swab DNA test. Agent Sedlmajer's interrogation tactics, including sympathizing with Brave Bird and repeating his statements, do not constitute inappropriate interrogation overbearing Brave Bird's will. See Kilgore, 58 F.3d at 353; United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (detailing the many routine ways that officers elicit confessions without violating the Fifth Amendment, including "deceiving the suspect" and "conveying sympathy"); United States v. Santos–Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002) ("[T]here is nothing inherently wrong with efforts to create a favorable climate for confession."); Jenner, 982 F.2d at 334 ("Numerous cases have held that questioning tactics such as . . . deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.").

Moving from the police conduct to the characteristics of the defendant, there is no evidence suggesting that Brave Bird was unusually susceptible to police coercion. The interview took place in the middle of the afternoon and lasted only 51 minutes. Gov't Ex. 20 at 2:08; Gov't Ex. 20. At the time of the interview, Brave Bird was 47 years old, had over ten years of formal education, and was able to understand the English language despite being dyslexic. Gov't Ex. 20 at 5:04, 6:30, 3:31, 7:10. During the course of the interview, Agent Sedlmajer asked Brave Bird whether he was under the influence of any alcohol or illegal or prescription drugs, and whether he was intimidated by

_____

[2] In fact, rather than implicitly promising leniency, Agent Sedlmajer corrected Brave Bird when he volunteered information suggesting a misunderstanding of the legal process. See Gov't Ex. 20 at 21:25–22:05 (after Brave Bird suggests that he can get released after the statements and swab, Agent Sedlmajer responds that it takes a while for the results to come in, he would have an initial hearing the following day, and he has no control over the decisions of the judge or prosecutors).

Agent Sedlmajer; Brave Bird responded no to all of the questions. See Gov't Ex. 20 at 7:15–7:56. The overall tone of the interview sounds relatively relaxed, with Brave Bird laughing at one point at his misunderstanding of what a buccal swab is. Gov't Ex. 20 at 20:21. The circumstances of the interview and the timing of inculpatory statements suggest that while Agent Sedlmajer used interview tactics to elicit admissions, the overall impact of the interrogation did not cause Brave Bird's will to be overborne, and his admissions were voluntary.

### D. Fruit of the Poisonous Tree

Finally, Brave Bird argues that the incriminating statements he made to Agent Sedlmajer and the buccal swab taken from him, along with the resulting DNA analysis, are inadmissible under the "fruits of the poisonous tree" doctrine. Doc. 45 at 3; Doc. 81 at 7–8. This doctrine generally requires the suppression of statements and evidence that flow from a violation of the Fourth Amendment. Wong Sun v. United States, 371 U.S. 471, 484–87 (1963). Because this Court finds that Yellow Eyes had the apparent authority to consent to a search of the basement, and the plain view doctrine was satisfied, there was no Fourth Amendment violation in this situation and Brave Bird's statements, buccal swab, and DNA analysis are not inadmissible under the "fruits of the poisonous tree" doctrine.

### III.   Conclusion

The evidence establishes that regardless of whether Yellow Eyes had the actual authority to consent to a search of the home, the investigating officers held a reasonable belief that Yellow Eyes had the apparent authority to consent to a search of the residence, including the basement. The evidence gathered in the residence was validly collected under the plain view doctrine, and as such Brave Bird's statements and buccal swab are not subject to exclusion under the fruit of the poisonous tree doctrine. Finally, there was no point in the interview where Agent Sedlmajer overbore the will of Brave Bird. Therefore, for the reasons stated above, it is hereby

13

ORDERED that the Amended Report and Recommendation, Doc. 80, is adopted to the extent explained herein. It is further

ORDERED that the Defendant's objections to the Amended Report and Recommendation, Doc. 81, are overruled. It is finally

ORDERED that the Defendant's Motion to Suppress Evidence and Statements, Doc. 44, is denied.

Dated this 8th day of November, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

14